**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**MARY LOU VOSBURGH and JAKE MCHERRON,**

**Plaintiffs,**

vs.                                                                    **1:18-CV-1003**
                                                                          **(MAD/CFH)**

**BURNT HILLS - BALLSTON LAKE CENTRAL**
**SCHOOL DISTRICT, PATRICK MCGRATH,**
**TIMOTHY BRUNSON, and JOE SCALISE,**

**Defendants.**
_____

**APPEARANCES:**                                         **OF COUNSEL:**

**COOPER, ERVING & SAVAGE, LLP**            **PHILLIP G. STECK, ESQ.**
39 North Pearl Street, 4th Floor
Albany, New York 12207
Attorneys for Plaintiffs

**GIRVIN & FERLAZZO, PC**                         **PATRICK J. FITZGERALD III, ESQ.**
20 Corporate Woods Boulevard
Albany, New York 12211
Attorneys for Defendants

**Mae A. D'Agostino, U.S. District Judge:**

## MEMORANDUM-DECISION AND ORDER

## I. INTRODUCTION

Plaintiffs commenced this action against Burnt Hills - Ballston Lake Central School

District (the "District") and its employees Patrick McGrath, Timothy Brunson, and Joe Scalise on

August 21, 2018, alleging violations of their procedural and substantive due process rights. *See*

Dkt. No. 1 at ¶ 1. Defendants moved to dismiss the action and Plaintiffs have cross-moved to

amend their Complaint to add a retaliation claim under the First Amendment. *See* Dkt. Nos. 14,

17. For the following reasons, Defendants' Motion to Dismiss is granted in its entirety and

Plaintiffs' Cross-Motion to Amend the Complaint is denied as futile.

## II. BACKGROUND

### A.    Facts[1]

#### *1.  Parties*

Plaintiffs are coaches of the girls lacrosse team in the District and are certified physical education teachers.  *See* Dkt. No. 1 at ¶ 8; Dkt. No. 17-2 at 9.  Plaintiff Jake McHerron has coached since 2009 and worked as a substitute teacher in the District for ten years.  *See* Dkt. No. 1 at ¶¶ 8, 14; Dkt. No. 17-2 at 12.  Plaintiff Mary Lou Vosburgh joined as an assistant coach in 2017.  *See* Dkt. No. 1 at ¶ 15.  Patrick McGrath is the Superintendent of the District, Timothy Brunson is the Principal of Burnt Hills - Ballston Lake High School, and Joe Scalise is the Athletic Director.  *See* Dkt. No. 1 at ¶¶ 9-11.

#### *2.  Complaints about Plaintiffs*

During the 2018 lacrosse season, some parents complained to Defendants about "minor incidents in which the coaches attempted to get the players to fit within the team concept, disputed some criticism of their children, were unhappy with allocations of playing time, etc." *See id.* at ¶¶ 18-20.  Plaintiffs believe that these criticisms did not involve "wrongdoing of any significant kind" and were "simply of the type normally directed at coaches from time to time." *See id.* at ¶¶ 21, 25.  Additionally, the conduct occurred under the supervision of Principal Brunson and Athletic Director Scalise, who never suggested that Plaintiffs change their coaching techniques.  *See id.* at ¶ 22.

#### *3.  Defendants' Response*

---

[1] The facts in this section were taken from the Complaint (Dkt. No. 1) and Proposed Amended Complaint (Dkt. No. 17-2 at 7-20).  For purposes of this motion, the Court will accept all material facts alleged as true and construe all reasonable inferences in Plaintiffs' favor.  *See Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir. 1994) (citation omitted).

On May 17, 2018, the District placed Plaintiffs on paid administrative leave while it investigated the misconduct allegations. *See* Dkt. No. 14-3 at 2; Dkt. No. 14-4 at 2. The investigation, in Plaintiffs' opinion, "relied on hearsay and innuendo." *See* Dkt. No. 1 at ¶ 30. According to Plaintiffs, the allegations were not supported by any reasonable evidence and "caused the plaintiffs to lose their employment." *See id.* at ¶ 37. Plaintiffs requested a name-clearing hearing twice, but Defendants denied both requests. *See id.* at ¶ 39.

While on leave, Plaintiffs were barred from school grounds. *See id.* at ¶ 26; *see also* Dkt. No. 14-3 at 2; Dkt. No. 14-4 at 2. This meant that McHerron could not pick up his children from school, and could only watch school sporting events from a distance. *See* Dkt. No. 1 at ¶ 26. Additionally, Defendants instructed McHerron to disassociate himself "from anything connected with Burnt Hills lacrosse," including the Burnt Hills - Ballston Lake Spartans Lacrosse Booster Club (the "Booster Club"), which is a not-for-profit corporation independent from the school.[2] *See* Dkt. No. 17-2 at 14. Plaintiffs allege that "the Booster Club was given confidential information about plaintiffs and the officers of the Booster Club used that information to make disparaging comments about the plaintiffs to lacrosse organizations in the Capital Region." *Id.* Plaintiffs claim that "defendants knew or should have known that officers, who had demonstrated hostility to plaintiffs, would engage in such conduct" and failed in their responsibility as supervisors of the Booster Club to prevent such misconduct from occurring. *See id.* at 14.

Plaintiffs claim that "Defendants acted to permanently stigmatize plaintiffs . . . by suggesting that plaintiffs were a danger to the health and safety of students, a claim that could

---

[2] Eventually, McHerron resumed attending Booster Club meetings because his son plays on the boys' varsity lacrosse team. *See* Dkt. No. 17-2 at 14. McHerron saw Brunson and Scalise at a Booster Club meeting on October 11, 2018, which was the first time in ten years McHerron had ever seen a member of the school administration attend a Booster Club meeting. *Id.*

potentially make them unemployable by any school district." *See* Dkt. No. 1 at ¶ 36. McHerron

no longer received substitute teaching assignments in the District, despite the fact that he had

substituted there in the past pursuant to a collective bargaining agreement between the District

and the School Alliance of Substitutes in Education (the "Substitutes CBA"). *See id.* at ¶ 27; Dkt.

No. 17-2 at 12. According to Plaintiffs, the Substitutes CBA gave McHerron certain procedural

rights, including the right to be notified of the reasons for his removal from substitute teaching.

Dkt. No. 17-2 at 12. McHerron never received such notification. *Id.*

### 4. *Publicizing the Allegations*

Plaintiffs allege that Defendants "publicly announced" their suspensions before the end of

the 2018 lacrosse season, *see* Dkt. No. 1 at ¶ 24, and notified the press about the complaints and

suspensions. *See id.* at ¶ 28 (alleging that Defendants "publicized the fact that there had been

parental complaints in the newspaper"); Dkt. No. 17-2 at 10 (alleging that Defendants notified the

press about the suspension). Additionally, Defendants told "members of the community" that the

coaches had created a "negative and hostile environment" and that the girls on the team were

victims of "battered girlfriend syndrome." *See* Dkt. No. 1 at ¶¶ 32-33. Defendants "accused the

coaches of doing things to girls which some parents claimed happened (for example, an alleged

physical altercation with a student) but the girls' own parents said never happened." *See id.* at ¶

29; Dkt. No. 17-2 at 12. Defendants also "stated to witnesses that Mary Lou Vosburgh was put in

the same category as Mr. McHerron for being complicit in or enabling his alleged behavior." *See*

Dkt. No. 17-2 at 13.

Further, Defendants caused the Capital Region Boards of Cooperative Educational

Services of New York State ("BOCES"), a service which makes substitute teachers available to

twenty four school districts, to place McHerron on a DO NOT CALL list. *See id.* at 11.

Defendants informed BOCES that McHerron was not allowed to substitute teach in the District in the 2018-2019 school year and submitted a report that listed several problems they had with McHerron. *Id.* These included: "[i]ssue as a role model," "[d]oes not take direction from administrators," "[i]neffective interaction with students," and "[d]oes not respect adults/students." *Id.* Plaintiffs believe that the "highly negative comments" contained in this report could prevent McHerron from ever again being hired as a substitute teacher or coach. *Id.* at 11, 14-15.

### 5. *Retaliatory Conduct*

As permanently certified physical education teachers, Plaintiffs are part of the Burnt Hills - Ballston Lake Teachers Association and their salaries as lacrosse coaches are set by a collective bargaining agreement (the "Teachers Association CBA"). *Id.* at 12. According to Plaintiffs, the Teachers Association CBA provides that coaches "will be notified in writing no later than sixty (60) days prior to the third anniversary date of their coaching assignments if their services are to be discontinued. After that date they may not be removed without a written statement of reasons which are relevant to the specific assignment." *Id.* On August 29, 2018, eight days after Plaintiffs filed this lawsuit, Defendants advertised the lacrosse coaching position as vacant on an online job forum. *Id.* at 13-14. Plaintiffs have not been notified that their services as coaches will be discontinued. *Id.* at 12. Still, Plaintiffs believe that there is "no indication from defendants that plaintiffs will ever be allowed to coach lacrosse at Burnt Hills again." *Id.* at 14. Because of this, Plaintiffs claim that they have been "constructively discharged." *See id.*

### B. Procedural History

Plaintiffs filed a Complaint against Defendants on August 21, 2018, alleging that Defendants violated their procedural and substantive due process rights. *See* Dkt. No. 1 at ¶¶ 38-39, 48. On October 15, 2018, Defendants filed a Motion to Dismiss for failure to state a claim

and requested that the Court consider two letters sent by the District to Plaintiffs on May 17, 2018 (the "May Letters"), which placed Plaintiffs on paid administrative leave.  *See* Dkt. Nos. 14, 14-3, 14-4.

Plaintiffs filed an Opposition to the Motion to Dismiss and Notice of Cross-Motion to Amend the Complaint on November 5, 2018.  *See* Dkt. No. 17.  Pursuant to Local Rule 7.1(a)(4), Plaintiffs attached a Proposed Amended Complaint, in which they added a First Amendment claim alleging that Defendants violated their right to petition the government for a redress of grievances.  *See* Dkt. No. 17-2 at 17-18.  On November 13, 2018, Defendants filed their Reply.  *See* Dkt. No. 18.

### III. DISCUSSION

**A.      Motion to Dismiss**

*1.  Standard of Review*

To survive dismissal for failure to state a claim, a party need only present a claim that is "plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).  While Rule 8(a) of the Federal Rules of Civil Procedure, which sets forth the general rules of pleading, "does not require detailed factual allegations, . . . it demands more than an unadorned" recitation of the alleged misconduct.  *Id.* (citations and quotation omitted).  In determining whether a complaint states a claim upon which relief may be granted, "the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor."  *Hernandez*, 18 F.3d at 136 (citation omitted).  However, "the tenet that a court must accept as true all of the allegations contained in a complaint

is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citation omitted).

### 2. *Proposed Amended Complaint*

Pursuant to Rule 15 of the Federal Rules of Civil Procedure, leave to amend a complaint should be freely given "when justice so requires." Fed. R. Civ. P. 15(a)(2). "[A]bsent evidence of undue delay, bad faith or dilatory motive on the part of the movant, undue prejudice to the opposing party, or futility, Rule 15's mandate must be obeyed." *Monahan v. N.Y.C. Dep't of Corrs.*, 214 F.3d 275, 283 (2d Cir. 2000) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)). "'An amendment to a pleading is futile if the proposed claim could not withstand a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6).'" *Annunziato v. Collecto*, Inc., 293 F.R.D. 329, 333 (E.D.N.Y. 2013) (quoting *Lucente v. Int'l Bus. Machs. Corp.*, 310 F.3d 243, 258 (2d Cir. 2002)). "Therefore a proposed amendment is not futile if it states a claim upon which relief can be granted." *Waltz v. Bd. of Educ. of Hoosick Falls Cent. Sch. Dist.*, No. 12-CV-0507, 2013 WL 4811958, *4 (N.D.N.Y. Sept. 10, 2013).

Plaintiffs have added a First Amendment claim in the Proposed Amended Complaint and Defendants have responded to the merits of that claim in their Reply. *See* Dkt. No. 17-2 at 17-18; Dkt. No. 18 at 14-16. As such, the Court will consider the Motion to Dismiss in light of the Proposed Amended Complaint. *See Haag v. MVP Health Care*, 866 F. Supp. 2d 137, 140 (N.D.N.Y. 2012). If the Proposed Amended Complaint cannot survive the Motion to Dismiss, then Plaintiffs' Cross-Motion to Amend will be denied as futile. *See Richardson v. Corr. Med. Care, Inc.*, No. 9:17-CV-420, 2018 WL 1580316, *3-4 (N.D.N.Y. Mar. 28, 2018).

### 3. *Materials Attached to Motion to Dismiss*

Defendants ask the Court to consider the May Letters, which formally placed Plaintiffs on paid administrative leave while the District investigated the parents' complaints. *See* Dkt. No. 14-1 at 8-9. Although Plaintiffs insist that they did not rely on these letters in drafting their Complaint, Defendants argue that Plaintiffs must have relied on them since the letters established the administrative leave, which was the "impetus for" the causes of action. *See* Dkt. No. 17-1 at 9-10; Dkt. No. 18 at 7. Additionally, Defendants argue that "[a]ny attempt by Plaintiffs' counsel to controvert the facts in the letters or to hide them from the Court would violate the provisions of Rule 11 of the Federal Rules of Civil Procedure and counsel's duty of candor to the Court." *See* Dkt. No. 18 at 7.

In considering a motion to dismiss, the Court may consider documents attached as an exhibit to the complaint or incorporated by reference in the complaint, documents that are integral to a plaintiff's claims, even if not explicitly incorporated by reference, and matters of which judicial notice may be taken. *See Thomas v. Westchester Cty. Health Care Corp.*, 232 F. Supp. 2d 273, 275 (S.D.N.Y. 2002) (citations omitted). To incorporate a document by reference, "the Complaint must make a clear, definite and substantial reference to the document[]." *Id.* at 275-76 (citations omitted). However, when a plaintiff chooses not to attach (or incorporate by reference) a document that is integral to the complaint and on which the complaint solely relies, the defendant may produce the document "when attacking the complaint for its failure to state a claim, because plaintiff should not so easily be allowed to escape the consequences of its own failure." *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991); *see also Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (finding that on a motion to dismiss, a court may consider "documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit" (internal quotation marks omitted)). "[A] plaintiff's

*reliance* on the terms and effect of a document in drafting the complaint is a necessary prerequisite to the court's consideration of the document on a dismissal motion; mere notice or possession is not enough." *Chambers*, 282 F.3d at 153 (emphasis in original).

When an attorney presents a pleading to the Court, the attorney certifies that to the best of his or her knowledge, information, and belief, formed after an inquiry that is reasonable under the circumstances, "the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery." Fed. R. Civ. P. 11. "The rules of professional responsibility . . . impose upon attorneys a duty of candor in all representations they make before a tribunal." *Mason Agency Ltd. v. Eastwind Hellas SA*, No. 09-CV-06474, 2009 WL 3169567, *2 (S.D.N.Y. Sept. 29, 2009).

The Court finds that Plaintiffs knew about the May Letters and relied on them in drafting the Complaint. *See Chambers*, 282 F.3d at 153. The causes of action all stem from the fact that Plaintiffs are no longer coaching in the District, and the May Letters are the documents that informed Plaintiffs that this was the case. *See* Dkt. No. 14-3 at 2 (informing McHerron that "[e]ffective May 17, 2018 the Burnt Hills-Ballston Lake Central School District has placed you on paid administrative leave from your position as Girls Varsity Lacrosse Coach"); Dkt No. 14-4 at 2 (informing Vosburgh that "[e]ffective May 17, 2018 the Burnt Hills-Ballston Lake Central School District has placed you on paid administrative leave from your position as Girls Varsity Lacrosse Assistant Coach"). Whether Plaintiffs were placed on paid administrative leave or have been terminated without procedural protections goes to the heart of this case. Yet, neither the Complaint or the Proposed Amendment Complaint actually discloses the fact that Plaintiffs are on paid administrative leave. Instead, the Complaint and Proposed Amended Complaint contain vague, misleading suggestions that Plaintiffs were suspended and terminated. *See* Dkt. No. 1 at ¶

24 (stating that "Defendants publicly announced a suspension of the coaches right before the end of the season"); *id.* at ¶ 37 (stating that unfounded allegations of misconduct "caused the plaintiffs to lose their employment"); Dkt. No. 17-2 at 10 (alleging that Defendants "notified the press of the suspension"); *id.* at 18 (alleging that Defendants "publiciz[ed] their suspension in the press"); *id.* at 15, 17-19 (alleging Plaintiffs' "loss of employment"); *id.* at 18 (stating that "Defendants linked plaintiff Vosburgh's termination with the termination of plaintiff McHerron"). The Court will not permit Plaintiffs to "evade a properly argued motion to dismiss simply because Plaintiff[s] ha[ve] chosen not to attach the [letters] to the complaint or to incorporate [them] by reference." *I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co.*, 936 F.2d 759, 762 (2d Cir. 1991).

Other evidence in the Complaint supports the Court's conclusion that Plaintiffs relied on the terms and effects of the May Letters to draft their Complaint and Proposed Amended Complaint. First, the May Letters specifically informed Plaintiffs that "[d]uring your period of administrative leave, you are not permitted to be on school grounds[.]" Dkt. No. 14-3 at 2; Dkt. No. 14-4 at 2. Both pleadings allege that Plaintiffs were barred from school grounds without citing to the May Letters. *See* Dkt. No. 1 at ¶ 26; Dkt. No. 17-2 at 11. Additionally, the May Letters informed Plaintiffs that the District was "undertak[ing] an investigation into potential misconduct," which is also discussed in both pleadings. *See* Dkt. No. 1 at ¶ 23 (alleging that Defendants "launched a so-called 'investigation' of the parents' complaints"); Dkt. No. 17-2 at 10 (same). As such, the Court finds that the May Letters are integral to Plaintiff's claims, and will consider the letters in deciding the pending motion to dismiss. *See Lawtone-Bowles v. City of N.Y., Dep't of Sanitation*, 22 F. Supp. 3d 341, 345 n.3 (S.D.N.Y. 2014) (finding that the court could consider a termination letter submitted with the defendant's motion to dismiss because the

complaint "relie[d] upon the terms and effect of this termination letter"); *Uwakwe v. Bridging Access to Care, Inc.*, No. 15-cv-6703, 2017 WL 1048070, \*3 (E.D.N.Y. Mar. 16, 2017) (same); *Advanced Marine Techs., Inc. v. Burnham Sec., Inc.*, 16 F. Supp. 2d 375, 378 (S.D.N.Y. 1998) (finding that a letter referred to and quoted by the complaint was incorporated by reference); *Kreiss v. McCown DeLeeuw & Co.*, 37 F. Supp. 2d 294, 298 n.3 (S.D.N.Y. 1999) (considering documents not attached to the complaint, but which were integral to the plaintiff's claims, and which the plaintiff had notice of and relied upon).

### 4. *Procedural Due Process*

In order to prevail on a Fourteenth Amendment procedural due process claim pursuant to 42 U.S.C. § 1983, "the plaintiff must show (1) that he possessed a protected liberty or property interest; and (2) that he was deprived of that interest without due process." *Rehman v. State Univ. of N.Y. at Stony Brook*, 596 F. Supp. 2d 643, 656 (E.D.N.Y. 2009) (citing *McMenemy v. City of Rochester*, 241 F.3d 279, 285-86 (2d Cir. 2001)). "Property rights arise from 'an independent source such as state law, [with] federal constitutional law determin[ing] whether that interest rises to the level of a legitimate claim of entitlement protected by the Due Process Clause.'" *Pilchen v. City of Auburn, N.Y.*, 728 F. Supp. 2d 192, 198 (N.D.N.Y. 2010) (quoting *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 9 (1978)) (other quotation marks and citation omitted) (alterations added by *Pilchen*). The essential principle of procedural due process is that a deprivation of life, liberty or property should be preceded by notice and an opportunity for a hearing appropriate to the nature of the case. *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985) (citation omitted). However, "[w]here there is a meaningful postdeprivation remedy, there is no due process violation." *Gudema v. Nassau County*, 163 F.3d 717, 724 (2d Cir. 1998).

### a. Property Interest

Plaintiffs allege that McHerron has a property interest in his substitute teaching assignments and claim that Defendants interfered with that right when they informed BOCES that McHerron was on the District's DO NOT CALL list. *See* Dkt. No. 17-1 at 10; Dkt. No. 17-2 at 1-2. Under New York law, a substitute teacher does not have a protected property interest in his employment. *See Rosendale v. Mahoney*, 496 Fed. Appx. 120, 121-22 (2d Cir. 2012). This is true even where the substitute teacher had regularly received substitute assignments in the past. *See Canty v. Bd. of Educ. of City of New York*, 470 F.2d 1111, 1113 (2d Cir. 1972) (finding that the mere "subjective expectancy" of a "regular" substitute teacher in New York City did not entitle the teacher to a due process hearing upon his dismissal because he was not a tenured employee). Therefore, McHerron did not have a property interest in the substitute teaching assignments, despite the fact that he regularly worked as a substitute teacher in the District in the past.

### b. Stigma-Plus Claim

Next, Plaintiffs allege that they have a liberty interest in their reputation, and that Defendants "permanently stigmatize[d] plaintiffs . . . by suggesting that plaintiffs were a danger to the health and safety of students." *See* Dkt. No. 1 at ¶ 36. This reputational harm has caused them "the loss of their employment" and has adversely impacted Plaintiffs' future employment opportunities. *See* Dkt. No. 17-1 at 14. Defendants respond that Plaintiffs cannot satisfy the "plus" factor of a stigma-plus claim because they have not been terminated from their coaching positions, and "'an employee who continues to be paid cannot sustain a claim for deprivation of property without due process.'" *See* Dkt. No. 14-1 at 10 (citing *Adams v. New York State Educ. Dep't*, 752 F. Supp. 2d 420, 453 (E.D.N.Y. 2010), *aff'd sub nom. Ebewo v. Fairman*, 460 Fed. Appx. 67 (2d Cir. 2012)).

The Supreme Court has made clear that there is no constitutionally protected property or liberty interest in one's reputation alone. *See Siegert v. Gilley*, 500 U.S. 226, 233 (1991) (citation omitted); *Paul v. Davis*, 424 U.S. 693, 701 (1976). However, when an individual is defamed or stigmatized in the course of his dismissal from public employment, he does have a cognizable liberty interest. *See Codd v. Velger*, 429 U.S. 624, 627 (1977); *Paul*, 424 U.S. at 701 & 710. This claim, which is known as a "stigma-plus" claim, is accorded only procedural due process protection - specifically, the right to an opportunity to refute the charges and clear one's name and reputation. *See Codd*, 429 U.S. at 627; *Paul*, 424 U.S. at 710; *Roth*, 408 U.S. at 573. A stigma-plus due process claim requires a plaintiff to establish "(1) the utterance of a statement about her that is injurious to her reputation, 'that is capable of being proved false, and that he or she claims is false,' and (2) 'some tangible and material state-imposed burden . . . in addition to the stigmatizing statement.'" *Velez v. Levy*, 401 F.3d 75, 87 (2d Cir. 2005) (quoting *Doe v. Dep't of Pub. Safety ex rel. Lee*, 271 F.3d 38, 47 (2d Cir. 2001), *rev'd on other grounds*, *Conn. Dep't. of Pub. Safety v. Doe*, 538 U.S. 1 (2003)).

"Stigmatizing statements" are those statements that "'call into question [the] plaintiff's good name, reputation, honor, or integrity'" or "'denigrate the employee's competence as a professional and impugn the employee's professional reputation in such a fashion as to effectively put a significant roadblock in that employee's continued ability to practice his or her profession.'" *Segal v. City of New York*, 459 F.3d 207, 212 (2d Cir. 2006) (quotations omitted). The defamatory statement "must be sufficiently public to create or threaten a stigma; hence, a statement made only to the plaintiff, and only in private, ordinarily does not implicate a liberty interest." *Velez*, 401 F.3d at 87 (citing *Donato v. Plainview-Old Bethpage Cent. Sch. Dist.*, 96 F.3d 623, 631-32 (2d Cir. 1996)). Finally, the plaintiff must show that the stigmatizing

statements were made in the course of, or in close temporal proximity to, a discharge or significant demotion. *See Patterson v. City of Utica*, 370 F.3d 322, 330 (2d Cir. 2004) (stating that "plaintiff must show the stigmatizing statements were made concurrently in time to plaintiff's dismissal"). "A negative impact on job prospects, or, for that matter, romantic aspirations, friendships, self-esteem, or any other typical consequence of a bad reputation, is insufficient." *Boss v. Kelly*, 306 Fed. Appx. 649, 651 (2d Cir. 2009) (internal quotation marks and citation omitted).

The Court finds that many of the allegations in the Complaint and Proposed Amended Complaint are not stigmatizing statements. First, statements informing the press that parents had complained about Plaintiffs and that Plaintiffs were on administrative leave cannot be stigmatizing utterances because they were the truth. *See Velez*, 401 F.3d at 87. Second, the allegation that Defendants "accused the coaches of doing things to girls which some parents claimed happened (for example, an alleged physical altercation with a student) but the girls' own parents said never happened," does not create or threaten a stigma because Plaintiffs have not alleged that the accusation was publicized. *See id.* Third, the allegation that the Booster Club made disparaging comments about Plaintiffs does not support the claims against Defendants because Plaintiffs do not actually allege any conduct by Defendants. *See* Dkt. No. 17-2 at 14. Finally, the report that Defendants submitted to BOCES with generalized feedback about McHerron was not a stigmatizing utterance because it contained only "vague statements of unspecified 'incompetence'" which do not damage an employee's professional reputation so as to require a hearing. *See O'Neill v. City of Auburn*, 23 F.3d 685, 692-93 (2d Cir. 1994) (finding that "[g]overnmental allegations of professional incompetence . . . will not support a cause of action for a name-clearing hearing unless the allegations go 'to the very heart of [the employee's]

professional competence,' and threaten to 'damage his professional reputation" (internal citation

omitted)); *c.f. Donato v. Plainview-Old Bethpage Cent. Sch. Dist.*, 96 F.3d 623, 631 (2d Cir.

1996) (discussing *O'Neill* and concluding that evaluations containing "extensively detailed lists"

of the employee's "supposed professional failings" would trigger a name-clearing hearing).

On the other hand, the Court finds that Plaintiffs have alleged two utterances that may

support a stigma-plus claim: (1) that the coaches had fostered a "negative and hostile

environment" and (2) that the girls on the team were victims of "battered girlfriend syndrome."

*See* Dkt. No. 1 at ¶¶ 32-33. These statements were made sufficiently public, because they were

told to "members of the community." *See Velez*, 401 F.3d at 87. Additionally, they may call into

question each Plaintiff's "'good name, reputation, honor, or integrity,'" and could be "significant

roadblock[s]" in Plaintiffs' abilities to continue to coach lacrosse or McHerron's ability to work as

a substitute teacher. *See id.*

However, even assuming that the two utterances are sufficiently stigmatizing, Plaintiffs

have not sufficiently alleged the "plus" prong of a stigma-plus claim. Courts in this Circuit have

universally held that the suspension of an employee with pay does not deprive that employee of a

legal right or status sufficient to satisfy the "plus" factor. *See e.g.*, *O'Connor v. Pierson*, 426 F.3d

187, 199 (2d Cir. 2005) (stating that "no court has held that an employee on fully paid leave has

been deprived of a property right merely by virtue of being relieved of his job duties"). This is

because employees do not have a property right in doing their job. *See Fitzgerald v. City of Troy,

N.Y.*, No. 1:10-CV-451, 2012 WL 5986547, *20 (N.D.N.Y. Nov. 28, 2012). Here, Plaintiffs were

fully paid while on administrative leave, so they have not been deprived of a property interest

without due process. *See O'Connor*, 426 F.3d at 199.

Still, Plaintiffs argue that even though the Complaint does not actually say that Defendants fired Plaintiffs, it contains "evidence" that Plaintiffs were terminated. *See* Dkt. No. 17-1 at 10 (citing Dkt. No. 1 at ¶¶ 24, 26-29, 31). This evidence includes allegations that Plaintiffs were suspended before the end of lacrosse season, Plaintiffs were "ostracized and barred" from the school, and McHerron was "denied further teaching assignments." *Id.* Even construing all reasonable inferences in Plaintiffs' favor, these allegations do not compel the Court to the conclusion that Plaintiffs were terminated. Rather, the Complaint and May Letters show that Defendants did not terminate Plaintiffs, but placed them on paid administrative leave. *See* Dkt. No. 14-3 at 2; Dkt. No. 14-4 at 2. Since Plaintiffs were fully paid during this time, they have not been deprived of a property interest without due process. *See O'Connor*, 426 F.3d at 199; *Fitzgerald*, 2012 WL 5986547, at *20.

Plaintiffs reliance on *Patterson v. City of Utica*, 370 F.3d 322 (2d Cir. 2004) is unavailing. According to Plaintiffs, in *Patterson* the Second Circuit held that a "non-tenured teacher who has been stigmatized in the course of a decision to terminate his employment is entitled to a name clearing hearing to clear his name and cure the injury to his reputation." *See* Dkt. No. 17-1 at 13. In actuality, *Patterson* is not about a teacher, but involves a stigma-plus claim brought by a city's Department of Public Works commissioner alleging that he was stigmatized during the course of his termination. *Patterson*, 370 F.3d at 327-29. Additionally, before permanently terminating the commissioner, the defendants had repeatedly fired and rehired him for short periods of time. *Id.* at 332. The court held that these repeated firings were not terminations because there was no evidence that the plaintiff was taken off the city payroll during those gaps in employment. *Id.* (stating that "[the commissioner's] time off the job is more analogous to a suspension than a termination" so "[i]t cannot, as a matter of law, be viewed as a significant alteration of plaintiff's

16

employment status"). Similarly here, Plaintiffs have not alleged that they have been taken off the District's payroll. Therefore, *Patterson* supports the Court's conclusion that Plaintiffs' paid administrative leave is not a termination for purposes of a stigma-plus claim.

Still, Plaintiffs argue that even if Defendants did not formally terminate them, Plaintiffs have been "constructively terminated" by the suspension because McHerron can no longer teach in the District and Plaintiffs have not been allowed to return as coaches. *See* Dkt. No. 17-1 at 11; Dkt. No. 17-2 at 14. Specifically, Plaintiffs allege that Defendants (1) told Plaintiffs that "a lot would have to change" before they would be allowed back, without ever telling them what changes should be made, (2) posted the coaching position as available on a statewide site for educators, (3) prevented McHerron from receiving substitute teaching assignments within the District, (4) made statements to BOCES "to the effect that Plaintiff McHerron was unqualified for any position in the District that involved interaction with students," and (5) linked Vosburgh's employment to McHerron's by accusing her of enabling McHerron's behavior. *See* Dkt. No. 17-1 at 11.

"[I]f a tenured employee who has been . . . suspended with pay . . . can make out a claim of constructive discharge, then he may have the same right to bring a procedural due process claim that he would have if he were fired." *O'Connor*, 426 F.3d at 200 n.5 (citing *Parrett v. City of Connersville*, 737 F.2d 690, 694 (7th Cir. 1984)). Constructive discharge requires a plaintiff to allege that "his working conditions were made so miserable that he was forced to quit." *Parrett*, 737 F.2d at 694. This is a "rigorous test" requiring "sufficient deliberate, abusive or otherwise intolerable working conditions that must exist to justify an involuntary resignation." *Adams*, 752 F. Supp. 2d at 431 (finding that tenured teachers suspended with pay were not constructively discharged).

In *Parrett*, the court held that a police chief was constructively discharged when he was targeted by a new town administration that made "no secret of the fact that they were 'going to get [him].'" *Parrett*, 737 F.2d at 693. After asking the plaintiff to quit and failing to find any misconduct which would have allowed them to fire him, the new administration transferred the plaintiff to a new position and told him he would not be assigned to any police duties, moved him into a windowless room without a telephone or furniture other than a desk and chair, and forced him to remain idle. *Id.* at 692-94. Although the plaintiff's pay did not change, eventually the forced idleness caused him to suffer a nervous collapse and cardiac abnormalities, resulting in his medical retirement from the police force. *Id.* at 694. In contrast, in *Adams*, the court found that tenured teachers were not constructively discharged although they were relieved of their job duties and transferred to Temporary Reassignment Centers (commonly known as "rubber rooms") because they continued to receive their full salaries and only two of the plaintiffs had resigned prior to the resolution of their disciplinary hearings. *Adams*, 752 F. Supp. 2d at 430-31.

As a primary matter, the constructive discharge doctrine is inapplicable here because Plaintiffs are not tenured employees. *See O'Connor*, 426 F.3d at 200 n.5. However, even if this doctrine did apply, Plaintiffs have not alleged that they involuntarily resigned. *See Adams*, 752 F. Supp. 2d at 431. Moreover, nothing in the Complaint suggests that Plaintiffs were subjected to "sufficient deliberate, abusive or otherwise intolerable working conditions." *Id.* Rather, similar to the teachers in *Adams*, Plaintiffs were removed from their positions temporarily while awaiting the results of an investigation into the allegations against them. Therefore, even if Plaintiffs had a right to their coaching positions similar to the right vested in tenured teachers, the Complaint does not allege facts that suggest a constructive discharge.

Next, Plaintiffs argue that a stigma-plus claim does not require the termination of a government employee, but only that the defamation occurs in the course of the "termination of some other legal right or status." *See* Dkt. No. 17-1 at 12. The Supreme Court has "strongly suggest[ed] that defamation, even if it leads to a significant loss of employment opportunities, is not a deprivation of a liberty interest unless it occurs in the course of dismissal or refusal to rehire the individual as a government employee or during termination or alteration of some other legal right or status." *Neu v. Corcoran*, 869 F.2d 662, 666-67 (2d Cir. 1989) (discussing *Paul v. Davis*, 424 U.S. 693 (1976)). Unfortunately, "[a]lthough it is clear that defamation 'plus' loss of government employment satisfies the . . . 'plus factor,' . . . outside that context, 'it is not entirely clear what the "plus" is.'" *DiBlasio v. Novello*, 344 F.3d 292, 302 (2d Cir. 2003) (quoting *Neu*, 869 F.2d at 667).

Here, Plaintiffs have not adequately alleged the termination of some other legal right or status. First, Plaintiffs rely on *White Plains Towing Corp. v. Patterson*, 991 F.2d 1049 (2d Cir. 1993) for the proposition that "[e]ven a person who has no property right in continued employment may have a due-process-protected liberty interest in not being dismissed." *See* Dkt. No. 17-1 at 13. In that case, the Second Circuit found that a towing company had not alleged the termination of a legal right or status because the company did not have a property right in receiving towing assignments from an "assignment system [that] contained no specificity as to the duration of the relationship." *White Plains Towing*, 991 F.2d at 1062. The court found that "[u]nder New York law, therefore, this plainly was a relationship that was terminable at will." *Id.* Similarly here, Plaintiffs did not have a property right in their coaching positions, as they were untenured employees whose relationships with the District were terminable at will. Therefore, they do not have a due-process-protected interest in their untenured jobs.

Plaintiffs also argue that they have alleged the "termination of some other legal right or status" because they have suffered an "adverse impact on future employment opportunities." *See* Dkt. No. 17-1 at 14. However, it is well established in this Circuit that "deleterious effects flowing directly from a sullied reputation, standing alone, do not constitute a 'plus' under the 'stigma plus' doctrine." *Cohane v. Nat'l Collegiate Athletic Ass'n*, 612 Fed. Appx. 41, 44 (2d Cir. 2015) (internal quotation marks and citation omitted) (finding no stigma-plus claim where a college basketball coach was investigated for violating conference rules, resigned during the investigation, and was subject to a "show-cause" order that greatly harmed his chances of seeking future employment). "When . . . the loss of job prospects is merely a 'normal repercussion[ ] of a poor reputation,' it cannot be the basis for a stigma-plus claim." *Id.* (citing *Valmonte v. Bane*, 18 F.3d 992, 1001 (2d Cir. 1994)). Therefore, any negative impact on Plaintiffs' job prospects is nothing more than a "typical consequence of a bad reputation," and cannot support a stigma-plus claim. *See Boss*, 306 Fed. Appx. at 651. Moreover, although Plaintiffs allege that the "battered girlfriend syndrome" and "negative and hostile environment" comments were made to "members of the community," nothing in the Complaint or Proposed Amended Complaint suggests that Defendants made these statements to Plaintiffs' prospective employers. Therefore, Plaintiffs' difficulty in finding employment is simply a "deleterious effect" of their now sullied reputations, which, standing alone, does not support a procedural due process claim. *Cohane*, 612 Fed. Appx. at 44.

Finally, Plaintiffs argue that McHerron enjoys a protected property interest in "the meaningful opportunity to seek employment" pursuant to his state-issued teaching license. Although the majority of Courts in this district have not recognized the existence of such a right, a small group of cases have held that "New York State recognizes that a teaching license entitles

its holder to a meaningful opportunity to seek employment pursuant to that license." *See Rogovin v. N.Y.C. Bd. Educ.*, No. 99-CV-3382, 2001 WL 936191, *4 (E.D.N.Y. Aug. 17, 2001) (citation omitted); *Lombard v. Bd. of Educ.*, 645 F. Supp. 1574, 1579 (E.D.N.Y. 1986) (holding that the plaintiff stated a Fourteenth Amendment cause of action for deprivation of property "because New York recognizes a teaching license as conferring a 'valuable property right' to seek employment which may not be withdrawn without due process"); *Mudge v. Zugalla*, No. 1:13-CV-891, 2014 WL 2453353, *4 (N.D.N.Y. June 2, 2014) (finding that the plaintiff adequately stated a procedural due process claim where the state's actions were the "functional equivalent of a revocation" of the plaintiff's teaching license).

In *Mudge*, a substitute teacher alleged that he was terminated after New York State Department of Education ("NYDOE") employees contacted his current employers with defamatory statements related to a prior suspension of his teaching license. *Mudge*, 2014 WL 2453353 at *1-2. The court found that the plaintiff adequately alleged that NYDOE employees interfered with his protected interest in the meaningful opportunity to seek employment pursuant to his state-issued teaching license because "the NYDOE has a virtual monopoly on state-issued teaching licenses, and actions by its employees to prevent an individual from working in its schools are tantamount to denying him the benefit of that license without any procedural due process." *Id.* at *4-5. Following the same reasoning, the school district defendants in that case did not constructively revoke the plaintiff's teaching license when they terminated him because "the conduct of individual school districts and superintendents impacts only plaintiff's per diem substitute teacher positions in those respective districts, it does not effectively deny him the opportunity to use his teaching license elsewhere in the state." *Id.*

Even if the Court were to find that McHerron has a property interest in the "meaningful opportunity to seek employment" pursuant to his state-issued teaching license, the Complaint and Proposed Amended Complaint do not allege that Defendants interfered with that right. Although McHerron can no longer substitute teach in the District, his license was not "constructively revoke[d]" because he still has every "opportunity to use his teaching license elsewhere in the state." *See id.* Unlike the NYDOE, the District does not have a virtual monopoly on teaching licenses, cannot issue McHerron's teaching license, and thus, cannot constructively revoke it. *See id.* at *4-5. Finally, unlike in *Mudge*, where the NYDOE sent letters and made phone calls to the plaintiff's employers, Plaintiffs do not allege that Defendants ever told future employers about the "negative and hostile environment" and "battered girlfriend syndrome" statements. *See* Dkt. No. 1 at ¶¶ 32-33. The other allegations about comments made to employers are merely conclusory statements that cannot survive a motion to dismiss. *See id.* at ¶ 36 (broadly asserting that Defendants "acted to permanently stigmatize" Plaintiffs which "*could potentially* make them unemployable by any public school district") (emphasis added); Dkt. No. 17-2 at 11, 14-15 (alleging that "highly negative comments" in the BOCES report *"could prevent* plaintiff McHerron from ever being hired") (emphasis added). As such, the claim that Defendants constructively revoked McHerron's substitute teaching license must fail.

Finally, Plaintiffs request a post-termination name-clearing hearing, and rely on *Handverger v. City of Winooski*, 605 Fed. Appx. 68 (2d Cir. 2015) for the proposition that such a hearing satisfies due process in the case of an at-will government employee. *See* Dkt. No. 17-1 at 13. Before an at-will government employee may get a name-clearing hearing, however, he must first demonstrate that he has a protected property or liberty interest. Here, as in *Handverger*, Plaintiffs have not alleged a cognizable property or liberty interest. *See Handverger v. City of*

*Winooski, Vt.*, No. 5:08-CV-246, 2013 WL 1386070, *15-16, 21 (D. Vt. Apr. 3, 2013).  As such, Plaintiffs' claims for procedural due process must be dismissed in their entirety.

### 5. *Substantive Due Process*

Defendants argue that Plaintiffs' substantive due process claim should be dismissed because Defendants' conduct was not so "outrageously arbitrary" or "conscience-shocking" as to constitute "a gross abuse of governmental authority."  *See* Dkt. No. 18 at 13.  Additionally, they argue that Plaintiffs' status as coaches and McHerron's status as a substitute teacher did not confer any constitutionally protected right upon them, and so the substantive due process claim must be dismissed.  *Id.*  Plaintiffs respond that the Complaint contains sufficient allegations for the Court to infer that Defendants had a "wrongful motive and no legitimate purpose" in suspending and stigmatizing Plaintiffs because they knew the parental complaints "were minor" and that the parents had "some personal vendetta" against Plaintiffs.  *See* Dkt. No. 17-1 at 20-22 (citing Dkt No. 1 at ¶¶ 13, 18-21, 22-25, 29, 31, 33-34).

Generally, to establish a substantive due process violation, a plaintiff must (1) identify the constitutional right at stake and (2) demonstrate that the government's action was conscience-shocking or arbitrary in the constitutional sense.  *See Little v. City of New York*, 487 F. Supp. 2d 426, 443 (S.D.N.Y. 2007) (citing *Lowrance v. Achtyl*, 20 F.3d 529, 537 (2d Cir. 1994)).  To satisfy his or her burden, a plaintiff must demonstrate that the defendant's actions were "so egregious, so outrageous, that [they] may fairly be said to shock the contemporary conscience." *County of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998); *see also Matican v. City of New York*, 524 F.3d 151, 158 (2d Cir. 2008).  The "shock the conscience" standard is not easily met; the plaintiff must show that the government's conduct was "egregious" and "outrageous," and "not merely incorrect or ill-advised."  *Ferran v. Town of Nassau*, 471 F.3d 363, 369-70 (2d Cir. 2006)

(internal quotation omitted). In school discipline cases, the Supreme Court has stated that, "[i]t is not the role of the federal courts to set aside decisions of school administrators which the court may view as lacking a basis in wisdom or compassion." *Wood v. Strickland*, 420 U.S. 308, 326 (1975) (finding that Section 1983 "was not intended to be a vehicle for federal court correction of errors in the exercise of [the discretion and judgment of school administrators] which do not rise to the level of violations of specific constitutional guarantees"); *see also Bd. of Educ. v. McCluskey*, 458 U.S. 966, 971 (1982) (following *Wood* and holding that the federal court should not replace a school board's construction of its rules with its "own notions under the facts of th[e] case").

As discussed in the preceding section, Plaintiffs have not identified a constitutional right stemming from their status as coaches or McHerron's status as a substitute teacher. Regardless, nothing in the Complaint or Proposed Amendment Complaint suggests that Defendants' conduct was so egregious that it violated Plaintiffs' substantive due process rights. Although Plaintiffs claim that the complaints about them were "minor" and "other coaches engaged in worse conduct and were not punished," the Complaint does not contain any factual allegations to support these conclusory statements. *See* Dkt. No. 17-1 at 21. Similarly, although Plaintiffs argue in their Opposition that some parents had a "personal vendetta" against them, the Complaint does not allege such a vendetta and contains no facts to support this. *See id.* Rather, the Complaint alleges that Defendants responded to parental complaints about coaching misconduct by placing Plaintiffs on paid administrative leave and investigating the allegations. *See* Dkt. No. 1 at ¶¶ 18-19; Dkt. No. 14-3 at 2; Dkt. No. 14-4 at 2. That decision was far from an egregious, outrageous response to the parents' misconduct allegations. *See Lewis*, 523 U.S. at 847 n.8. Moreover, while Plaintiffs criticize Defendants for informing the press about the suspension, the Complaint does

not allege facts to support Plaintiffs' claim that Defendants' only intent in doing so was to "malign" Plaintiffs. *See* Dkt. No. 17-1 at 21. Assuming the allegations in the Complaint to be true, Defendants informed a local newspaper that they placed two coaches on paid administrative leave while they investigated complaints about them. *See* Dkt. No. 1 at ¶ 28; Dkt. No. 17-2 at 10. Even if the Court believed that the decision to inform the press was "incorrect or ill-advised," *see Ferran*, 471 F.3d at 369-70, it is not the role of this Court to "set aside decisions of school administrators which the court may view as lacking a basis in wisdom or compassion." *See Wood*, 420 U.S. at 326.

Accordingly, Plaintiffs' substantive due process claim is dismissed.

**E.    Motion to Amend**

*1.  Legal Standard*

According to Rule 15 of the Federal Rules of Civil Procedure, since Plaintiffs did not amend their Complaint within 21 days after serving it or after service of Defendants' Rule 12(b) motion, they now "may amend [their] pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). Notwithstanding this lenient standard, the decision to grant or deny leave to amend is within the discretion of the district court. *See Foman*, 371 U.S. at 182. A district court may properly deny leave to amend for "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc." *Id.*. An amendment of a pleading is considered "futile" when the proposed new claim would not withstand a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure. *See Ricciuti v. N.Y.C. Transit Auth.*, 941 F.2d 119, 123 (2d Cir. 1991) (stating that "[w]hen the

plaintiff has submitted a proposed amended complaint, the district judge may review that pleading for adequacy and need not allow its filing if it does not state a claim upon which relief can be granted").  Additionally, Local Rule 7.1(a)(4) requires that a party moving to amend a pleading attach an unsigned copy of the proposed amended pleading to its motion papers.  N.D.N.Y. L.R. 7.1(a)(4).

Plaintiffs have submitted a Proposed Amended Complaint in compliance with Local Rule 7.1(a)(4).  *See* Dkt. No. 17-2.  The Proposed Amended Complaint alleges new facts in support of its procedural due process and substantive due process claims, which the Court addressed *supra*. Additionally, Plaintiffs now allege that Defendants retaliated against them for filing this lawsuit, in violation of the First Amendment.  *See id.* at 17-18.  The Court has reviewed this new allegation and, as discussed below, finds that it cannot withstand a motion to dismiss.

### 2. *First Amendment Retaliation Claim*

Plaintiffs allege that Defendants retaliated against them by "taking action to deprive them of their coaching positions after the lawsuit was filed."  *See* Dkt. No. 17-1 at 22.  Defendants respond that Plaintiffs have not adequately pleaded this claim because they have not alleged that the District has made any hiring decisions for the coaching positions.  *See* Dkt. No. 18 at 14.

"[T]he Second Circuit has 'described the elements of a First Amendment retaliation claim in several ways, depending on the factual context.'"  *Sloup v. Loeffler*, No. 05-CV-1766, 2008 WL 3978208, *22 (E.D.N.Y. Aug. 21, 2008) (quoting *Williams v. Town of Greenburgh*, 535 F.3d 71, 76 (2d Cir. 2008)).  In order for a public employee to establish a First Amendment retaliation claim, the employee must prove that "(1) he engaged in constitutionally protected speech; (2) he suffered an adverse employment action; and (3) the speech was a 'motivating factor' in the adverse employment decision."  *Gusler v. City of Long Beach*, 823 F. Supp. 2d 98, 123 (E.D.N.Y.

2011) (quotation omitted). A government employee's speech is constitutionally protected if the employee is speaking in his capacity as a citizen on a matter of public concern. *See Weintraub v. Bd. of Educ.*, 593 F.3d 196, 201-02 (2d Cir. 2010) (citations omitted). This is because the government "may not deny a benefit to a person on a basis that infringes his constitutionally protected interests - especially, his interest in freedom of speech. [. . .] We have applied this general principle . . . regardless of the public employee's contractual or other claim to a job." *Perry v. Sinderman*, 408 U.S. 593, 597 (1972); *see also Mazurek v. Wolcott Bd. of Educ.*, 815 F. Supp. 71, 76 (D. Conn. 1993) (finding that a substitute teacher alleged a First Amendment retaliation claim where a school stopped giving her substitute teaching assignments after she complained about its hiring practices).

### a. Constitutionally Protected Speech

"Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick v. Myers*, 461 U.S. 138, 147-48 (1983). The Second Circuit has held that "[t]he heart of the matter is whether the employee's speech was 'calculated to redress personal grievances or whether it had a broader public purpose.'" *Ruotolo v. City of New York*, 514 F.3d 184, 187-89 (2d Cir. 2008) (internal citation omitted) (finding that a police officer who alleged that he was retaliated against after he wrote a report that identified serious health concerns in the precinct was not speaking on a matter of public concern because the lawsuit sought to redress his personal grievances, not to advance a public purpose).

In the present matter, Plaintiffs have not adequately alleged that they engaged in constitutionally protected speech. Although Plaintiffs argue that "[t]he problem of abusive behavior by coaches . . . has long been a matter of public concern," they do not cite to any cases

to support this statement. *See* Dkt. No. 17-1 at 24. Plaintiffs allege that their due process rights have been violated, and they filed this lawsuit to "redress [these] personal grievances," not to serve "a broader public purpose.'" *Ruotolo*, 514 F.3d at 189; *see also Ezekwo v. N.Y.C. Health & Hosps. Corp.*, 940 F.2d 775, 781 (2d Cir. 1991) (finding that a doctor's discrimination allegations were not matters of public concern because the plaintiff "was not on a mission to protect the public welfare. Rather, her primary aim was to protect her own reputation and individual development as a doctor"). Therefore, the Court finds that Plaintiffs did not file this lawsuit as "concerned citizens." *See Hanig v. Yorktown Cent. Sch. Dist.*, 384 F. Supp. 2d 710, 722 (S.D.N.Y. 2005) (finding that "[t]he key inquiry is whether the statements were made by plaintiff in her role as a disgruntled employee or her role as a concerned citizen"). In the alternative, Plaintiffs argue that Defendants "made the issues involving plaintiffs a matter of public concern by publicizing their suspension in the press." *See* Dkt. No. 17-2 at 18. Again, Plaintiffs do not cite to any cases for the proposition that a defendant's conduct can transform a private statement into a matter of public concern. Since the filing of the Complaint had the primary aim of repairing Plaintiffs' reputations and future job prospects as coaches and a teacher, the Court finds that it is not speech about an issue of public concern.

Plaintiffs' reliance on *Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ.*, 444 F.3d 158 (2d Cir. 2006) is misplaced. *Cioffi* involved a letter and press conference about a hazing incident in which a student was sexually assaulted on school property. *Id.* at 164. The Second Circuit held that the letter and press conference were constitutionally protected speech because "[t]he incident itself, the deficiencies in adult supervision that allowed it to occur, and the possible insufficiencies of the school's response implicate[d] the health, welfare and safety of young students" and were all "matters of importance to the public." *Id.* Unlike in *Cioffi*, here the speech

did not take the form of public statements about community issues, but rather was the filing of a complaint which alleged violations of Plaintiffs' personal rights. The fact that the Complaint "could be construed broadly to implicate matters of public concern does not alter [its] general nature . . . ." *Ezekwo*, 940 F.2d at 781. Accordingly, the Court finds that Plaintiffs have not adequately alleged that they engaged in constitutionally protected speech.

### b. Adverse Employment Action

"[W]hether a particular action constitutes an adverse employment action in the First Amendment retaliation context, a plaintiff must show that the retaliatory action 'would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights.'" *Monsour v. N.Y. State Office for People With Developmental Disabilities*, No. 1:13-CV-336, 2017 WL 3972044, *5 (N.D.N.Y. July 7, 2017) (quoting *Zelnik v. Fashion Inst. of Tech.*, 464 F.3d 217, 225 (2d Cir. 2006)) (other citation omitted). Adverse employment actions "typically 'include discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand.'" *Gallagher v. Town of Fairfield*, No. 3:10-CV-1270, 2011 WL 3563160, *4 (D. Conn. Aug. 15, 2011) (quoting *Morris v. Lindau*, 196 F.3d 102, 110 (2d Cir. 1999)). Although lesser actions may meet the adversity threshold, the Second Circuit has "not explicitly defined what quantum of lesser actions constitutes an adverse employment action." *Amato v. Hartnett*, 936 F. Supp. 2d 416, 432-33 (S.D.N.Y. 2013) (citing *Phillips v. Bowen*, 278 F.3d 103, 109 (2d Cir. 2002)). However, the Second Circuit has instructed that "[s]uch actions may also include a pattern of harassment, where, using an 'objective standard,' a plaintiff shows that 'the total circumstances of her working environment changed to become unreasonably inferior and adverse when compared to a typical or normal, not ideal or model, workplace.'" *Montero v. City of Yonkers, N.Y.*, 890 F.3d 386, 401 (2d Cir. 2018) (citing *Phillips*, 278 F.3d at 109).

Here, Plaintiffs have not alleged anything that would "deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." *Monsour*, 2017 WL 3972044, at *5. Plaintiffs have not been terminated from their jobs, and they have not alleged that their "working environment changed to become unreasonably inferior and adverse when compared to a typical or normal . . . workplace." *Phillips*, 278 F.3d at 109. Plaintiffs argue that this lawsuit was at least a "motivating factor" in Defendants posting the coaching position as "vacant." *See* Dkt. No. 17-2 at 13-14. However, the job posting did not affect Plaintiffs at all, since no hiring decisions have been made. In fact, there are no allegations that Plaintiffs' working environment changed after they initiated this action, as Plaintiffs were on paid administrative leave both before and after they filed the Complaint. Therefore, the Court finds that Plaintiffs did not suffer an adverse employment action.

Accordingly, since Plaintiffs have failed to allege that they engaged in constitutionally protected speech and suffered an adverse employment action as a result of that speech, the Court finds that they have failed to state a claim for retaliation under the First Amendment.

### 3. *Amendment is Futile*

After reviewing all of the allegations in the Proposed Amended Complaint, the Court finds that it would not withstand a motion to dismiss. *See Ricciuti*, 941 F.2d at 123. As such, Plaintiffs' Cross-Motion to Amend the Complaint is denied as futile. *See id.*

## IV. CONCLUSION

After carefully reviewing the Complaint, the parties' submissions, and the applicable law, the Court hereby

**ORDERS** that Defendants' Motion to Dismiss (Dkt. No. 14) is **GRANTED** in its entirety; and the Court further

**ORDERS** that Plaintiffs' Cross-Motion to Amend the Complaint (Dkt. No. 17) is

**DENIED**; and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in Defendants' favor and close

this case; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision

and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: January 24, 2019
      Albany, New York

Mae A. D'Agostino
U.S. District Judge